**GLASS, MOLDERS, POTTERY, PLASTICS AND ALLIED WORKERS INTERNATIONAL UNION, AFL–CIO and Local Union No. 4, Plaintiffs,**

v.

**OWENS–ILLINOIS, INC., Defendant.**

**OWENS–ILLINOIS, INC., Plaintiff,**

v.

**GLASS, MOLDERS, POTTERY, PLASTICS AND ALLIED WORKERS INTERNATIONAL UNION, AFL–CIO, Defendant.**

**Civ. Nos. 90–3236, 90–3291 (MHC).**

United States District Court,
D. New Jersey.

Feb. 4, 1991.

*Communications Union,* 628 F.2d 156, 159–60    (D.C.Cir.1980).

James Katz, Robert F. O'Brien, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for Glass, Molders, Pottery, Plastics and Allied Workers Intern. Union.

James F. Hammill, McCarter & English, Cherry Hill, N.J., for Owens–Illinois, Inc.

## OPINION

GERRY, Chief Judge:

Presently before the Court is a motion for summary judgment by plaintiffs, Glass, Molders, Pottery, Plastics and Allied Workers International Union, AFL–CIO and its Local Union Number 4 (collectively "the Union") to enforce an arbitration award and for prejudgment interest, costs and reasonable attorneys fees, and a cross-motion for summary judgment by defendant, Owens–Illinois, Inc. ("Owens") to vacate the arbitration award. For the reasons set forth below, the Union's motion will be

granted and Owens' cross-motion will be denied.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Introduction

For over 25 years, Owens and the Union have been parties to a succession of collective bargaining agreements covering the terms and conditions of employment for employees of Owens' metal closure plant in Glassboro, New Jersey. The latest collective bargaining agreement which was in effect at all times material to this action became effective April 1, 1986, and was to expire March 31, 1989. On or about January 5, 1989, however, Owens sold the Glassboro plant pursuant to an Asset Purchase Agreement ("the Agreement") entered into on November 14, 1988 between Owens and Anchor Hocking Corporation ("Anchor"). Anchor acquired the plant for approximately $36 million. As a condition of the sale, Section 13(b) of the Agreement expressly provided that Owens would absolve Anchor from assuming any obligation under any collective bargaining agree-

ment.[1] The Agreement also provided that Anchor would have no obligation to hire any of Owens' Glassboro employees, but that Owens would nonetheless encourage its employees to work for Anchor. Additionally, Owens agreed not to solicit or offer employment to any employee for 180 days following the closing. Agreement, § 13(a).

Anchor offered employment to all affected employees upon the sale of the plant. On January 5, 1989, there was a 100% turnout by the former Owens employees, and all were eventually hired by Anchor. Accordingly, there was no loss of work as a result of the sale. Anchor announced its intention to negotiate a new agreement with the Union as soon as possible and eventually entered into a new 3-year collective bargaining agreement commencing April 1, 1989. Prior to the new agreement, Anchor continued the current wage rate, however, knowing it was not bound by the Owens–Union collective bargaining agreement, instituted a number of changes in the terms of employment.[2] These changes

---

1. The relevant provision provides:
   *Employee Agreements, Including Collective Bargaining Agreements.* It is understood and agreed that this Agreement does not obligate Buyer to assume any of Seller's liabilities or obligations under any collective bargaining agreement or other employment agreement, express or implied, relating to persons employed by Seller, and that, even if Buyer elects to assume Seller's rights and prospective obligations under any such collective bargaining agreement or other employment agreement, in no event will Buyer assume any liability or obligation arising out of *any such collective bargaining agreement or other employment agreement relating to any transaction, event or activity occurring or condition or state of facts existing at or prior to the time of the Closing.*

2. Anchor posted the following press release to the new employees on January 5, *1989:*
   It is my pleasure to inform you that effective today, Anchor Hocking Packaging Co., a division of Newell Co., has acquired Owens–Illinois' plant here in Glassboro, New Jersey. We are glad that we have combined your great product lines with Anchor Hocking's and we are enthusiastic about the future.
   As your prospective new employer, we offer employment to each and every one of you in accordance with this notice and the attached summary of changes. While we have chosen

not to adopt the collective bargaining agreements between Owens–Illinois and the Glass, Molders, Pottery, Plastics & Allied Workers International Union, we will apply the working conditions set forth in those agreements ... as modified by the changes described in detail in the attachment. Please read the attachment carefully. We would like you to note that all current wage rates are being continued and, other than slightly increased insurance premium contributions, no significant changes are being made in your basic fringe benefits.
   You may indicate your acceptance of the Company's offer of employment by continuing to report for work in accordance with your previously established schedule. Within the next few days, after we have hired a substantial and representative complement of employees, we will be able to determine *whether the law permits us to recognize and* bargain with the union. As soon as the law allows, we intend to commence negotiations with the union over the terms of an initial labor agreement. Naturally, during those negotiations, all terms and conditions of employment will be subject to bargaining.
   We are confident that each employee who accepts our offer for employment will enjoy being a part of the Newell family, and we encourage you to join with us in tackling the challenges of the future. If you have any

included the elimination of severance pay, personal days off, a decrease in employer contributions to retiree benefits, and an increase in employee contributions to insurance plans. Specifically, the summary of changes included the following:

*Side Agreement, Letters and Practices*—Are not binding on the Company.

. . . .

*Layoff Notice*—All requirements of advance notice for layoff, including but not limited to those set forth in Article 3 of Owens–Illinois' Union Shop Contract, are eliminated.

. . . .

*Subcontracting*—All restrictions against the Company's management right to subcontract, including but not limited to any restrictions set forth in Article 30 of Owens–Illinois' Union Shop Contract, are eliminated.

*Article 28 of Owens–Illinois' Union Shop Contract*—All transfer, notice and other rights set forth in this Article are eliminated.

*Special Call Assignments*—Any and all restrictions against the work that may be performed by employees summoned to work under a special call, including but not limited to all restrictions set forth in Article 5, Section 4(c) of Owens–Illinois' Local Union–Management Agreement, are eliminated.

*Filling of Vacancies*—Any and all restrictions against the Company's management rights to fill vacancies, whether scheduled or unscheduled, including but not limited to those set forth in Section 1(g) of the Owens–Illinois' Local Union–Management Agreement, are eliminated.

. . . .

*Arbitration*—Upon lawful recognition of the union, the Company will propose an interim written agreement permitting the union to submit certain disputes to arbitration as a matter of right and reserving to the Company discretion to accept or decline requests to submit other disputes to arbitration. . . .

questions, please raise them with your supervisor or direct them to the personnel office.

*Successors, Transferees and Assigns*—All restrictions against the Company's management right to sell or transfer the plant, including but not limited to those set forth in Article 33 of Owens–Illinois' Union Shop Contract, are eliminated.

*Cost of Living Allowances*—Including but not limited to all terms and conditions set forth in Article 38 of Owens–Illinois' Shop Contract, are eliminated.

*Personal Days Off*—Are eliminated.

*Vacation Pay*—Accrued vacation pay will not be payable to employees discharged for cause.

*Insurance*—Employees will be required to contribute 15% of the total cost of the insurance plan selected by each employee. Further, all rights to Company paid insurance benefits following plant closure, including but not limited to all rights set forth in Article 21, Section 8(h) of Owens–Illinois' Union Shop Contract, are eliminated. . . .

*Retiree Benefits*—As set forth in Article 20 of Owens–Illinois' Union Shop Contract, will be continued. However, the Company will not contribute more than the currently required $.18 per employee hour actually worked.

*Severance Pay*—All rights to severance pay, including but not limited to all rights set forth in Article 31 of Owens–Illinois' Union Shop Contract, are eliminated.

There is some dispute as to when the Union became aware of the sale of the plant as well as the terms and conditions of the Agreement. The Union maintains that, although certain representatives of the Union heard about the Agreement in November of 1988, they were only informed that the sale was not final and was dependent upon governmental approval. They were not provided with a copy of the Agreement until four months after the closing. The Union further maintains that they were not consulted regarding the terms of the Agreement during the negotiation process. Owens alleges that the Union knew about

/s/
William K. Doppstadt
Vice President, Human Resources

the sale to Anchor approximately six weeks before the closing, and that Frank Cibo, the Union International Representative assigned to Glassboro, learned by telephone on January 3rd that the sale would be finalized on January 5th and that Anchor would not assume the collective bargaining agreement. Owens maintains, and the Union does not dispute, that the Union never undertook to urge Anchor to assume the collective bargaining agreement prior to the sale.

On January 6, 1989, the Union filed a grievance with Owens as a result of the alleged losses incurred by the employees upon the sale of the Glassboro facility to Anchor. The grievance was denied and, in May of 1989, Owens and the Union agreed to submit the matter to arbitration where both parties would frame the issues for the arbitrator. *See* Plaintiff's Exhibits 10 & 11 in Support of Their Motion to Enforce the Arbitration Award.

Several provisions of the Owens–Union collective bargaining agreement form the basis of the dispute. The most pertinent provisions include the following:

## ARTICLE 1

### Duration

Section 1. This contract shall become effective April 1, 1986, and shall continue in effect through March 31, 1989, and as long thereafter as regular negotiations for the making of a new Contract are in progress.

. . . .

Section 3. No changes may be made in this Contract unless mutually approved by the Company, the International Officers of the Glass, Pottery, Plastics & Allied Workers and representatives of the Local involved.

. . . .

## ARTICLE 9

### Arbitration

Section 1. All disputes not settled pursuant to the procedure set forth in Article 8, Grievance Procedure, may be re-ferred to arbitration by a notice given to the Company or the Union by the other within ten days after the conclusion of Step 3 of the grievance procedure. Such notice shall be in writing, setting forth the matter in dispute and the relief requested.

. . . .

Section 5. The arbitrator shall have no power to add to, subtract from, or modify the terms of this Contract or to set standards of production. The arbitrator's decisions shall be final and binding upon both parties.

. . . .

## ARTICLE 19

### Retirement Income

Section 17. Effective 4/1/83, when the Company elects to close a plant permanently, an employee under age 60 whose employment is terminated as a result of such closing on or after 4/1/83, may retire and receive a pension benefit figured as if he were age 60 based on his years and months of credited service at the date of such closing, provided he has thirty (30) or more full years of credited service at the date of such closing.

. . . .

## ARTICLE 31

### Severance Pay

If the Company elects to permanently close the Glassboro Plant or a department, severance shall be paid on the basis of 25 hours per credited year of service with a maximum of 750 hours payable.

. . . .

## ARTICLE 33

### Successors, Transferees and Assignees

This contract shall be binding upon the parties hereto, their successors, transferees and assignees. In the event the Company sells or transfers this plant, this agreement shall remain in full force and effect and be binding upon the purchaser or transferee.

## B. *The Arbitrator's Opinion*

As previously agreed, both parties submitted a statement of the issues for the arbitrator. Essentially, three issues were presented concerning liability: (1) whether Owens violated Article 33 of the collective bargaining agreement by failing to condition the sale of the plant on the assumption by Anchor of the collective bargaining agreement; (2) whether Owens violated Article 31 of the collective bargaining agreement by not making severance payments to its former employees; and (3) whether Owens violated Article 19, Section 17 of the collective bargaining agreement by failing to implement the pension benefit provisions applicable to the class of employees defined in that provision.[3]

### 1) Article 33—The Successorship Clause

The arbitrator, Rolf Valtin, first addressed the issue concerning the Article 33 successorship clause. He summarized the five arguments put forward by Owens, which can be further summarized: (1) the language of Article 33 does not provide for an active duty to be performed by Owens; rather, it is a passive successorship clause which frees Owens of liability if the purchaser does not assume its obligation to be bound by the collective bargaining agreement; (2) the parties did not intend for Owens to be liable in this instance since, in prior negotiations between Owens and the Union, the Union proposed and Owens rejected, a more extensive successorship clause which expressly obligated Owens to require any proposed purchaser to assume the terms of the collective bargaining agreement; (3) the parties did not intend for Owens to be liable in this instance since, in subsequent negotiations between the Union and Owens covering other facilities, the Union proposed, and Owens accepted, the following addition to the successorship clause which was previously identical to Article 33: "and the Company agrees it will include in the purchase agreement that this Contract is binding on the purchaser or transferee;" (4) Owens' position

is in accordance with the "successorship doctrine," which holds that the purchaser of a bona fide sale of an employing company may only be obligated to bargain with a prior union, but does not require that the new employer be bound by the previous labor agreement; and (5) the Union should be estopped from seeking to hold Owens liable since it did not assert its rights against Anchor. *See, Owens–Illinois, Inc.*, at 8–12 (unreported) (Valtin, Arb.) [hereinafter "Arb. Op."] Plaintiff's Exhibit 1 in Support of Their Motion to Enforce the Arbitration Award.

Arbitrator Valtin rejected each of these arguments. He initially observed that "there simply cannot be any question that Article 33 was breached." Arb. Op., at 12. He reasoned that the duration was a term of the contract and that, when Owens treated the contract as no longer binding with the arrival of the successor, three months short of its duration, they clearly breached the first sentence of Article 33 which states that "[t]his contract shall be binding upon the parties hereto, [and] their successors...." *Id.* He found that the second sentence of Article 33 was "more particularized" than the first sentence, since it presupposed the sale or transfer of the plant and required that the agreement remain in full force and effect and be binding on the purchaser or transferee. Since there was a sale of the plant three months prior to the agreement's duration and the purchaser was not bound by the agreement, a "clearer disregard of a clear commitment is difficult to imagine." *Id.* at 13. He stated that the commitment of Article 33 must be viewed as a commitment by Owens to the Union, since the parties to the agreement were the two signatories to the agreement and no others. Moreover, the commitment was in no way conditional on finding a purchaser who would assume the agreement.

The arbitrator also stressed that this was not a case where the assumption or non-assumption of the collective bargaining

---

**3.** As discussed *infra,* the Union provided six issues to the arbitrator. In addition to the three issues paraphrased above, the Union added the following after each issue: "If so, what is the proper remedy?"

agreement was overlooked in the negotiating process, nor was it one in which the purchaser gave an understanding that the agreement would be kept in effect and then abandoned it. Rather, the negotiators all had copies of the collective bargaining agreement and were aware of Article 33 and acted in plain defiance of that provision. Because Owens was a partner in the adoption of Section 13(b) of the Agreement, Arbitrator Valtin rejected Owens' passive/active theory as "not even deserving of a sympathetic ear on the circumstances of the present case." *Id.* at 14.

Moreover, the arbitrator did not view the federal successorship doctrine as a matter of concern in this case since Article 33 does not state that the purchaser is to recognize the Union and engage in bargaining for a new agreement. "[A]s to the commitment which *is* made under Article 33," he added, "there is no contention that it is to be discarded, or otherwise to be treated as unenforceable, for lack of validity under the law." *Id.* (emphasis in original).

As to Owens' contentions regarding prior and subsequent negotiations with the Union for the Glassboro and other plants, the arbitrator held that the additional language was, essentially, superfluous; it merely implemented what was already required under the provision as written.

The arbitrator rejected Owens' estoppel argument as burden-switching. He questioned whether the Union could have done anything differently. They clearly could not have been a rightful participant in the negotiations leading to the Agreement. After the consummation of the Agreement, although the Union could have insisted—presumably by striking—on the resurrection of the Owens–Union collective bargaining agreement, this course of action should not be a condition of arbitrating the fulfillment of Owens' promise under Article 33.

Having concluded that Owens breached Article 33 of the collective bargaining agreement, the arbitrator next addressed the remedy. He held that, although the "technically correct" answer is to undo what has wrongfully taken place, "this would mean voiding the sale as an improper act under Article 33, the retroactive application of the [Owens–Union agreement] through its expiration date with whatever make-whole consequences might be involved, and the retroactive negotiation of a new [Owens–Union agreement], with the former ... agreement as the base from which the parties would have negotiated for the new Agreement, with whatever make-whole consequences this would entail." *Id.* at 18. However, in view of the enormous difficulties this would involve, likely throwing the parties into protracted litigation, and because neither party has asked for this remedy, Arbitrator Valtin treated the severance and retirement income issues as linked with the remedy under Article 33. *Id.* at 19. He noted that those two issues could not have arisen if the collective bargaining agreement had remained in effect and, accordingly, proceeded with the severance issue.

2) Article 31—Severance Payments

The next key issue was whether Owens "permanently close[d]" the Glassboro plant, triggering the severance payment formula set forth in Article 31. The purpose of severance pay, the arbitrator observed, is to cushion the impact for employees who have been dismissed without expectation of returning to work. Another purpose, he surmised, was that it may be viewed as a reward for past service in the face of loss of employment. *Id.* at 22. However, "[h]ere, both the plant and its operations stayed intact and there was no cessation—indeed, not even an interruption—in employment. And if it is granted—as it must—that the plant was not permanently closed within the usual meaning of the term, it must also be granted (in the absence of evidence respecting the negotiating discussions) that the plant was not permanently closed as the parties intended the term to be applied when they adopted Article 31." *Id.*

Nonetheless, he determined that the severance pay called for in Article 31 is properly applied in rectification of the violation of Article 33. He reasoned that

in overall impact, the loss was severe and involved hardships which are not dissimi-

lar to the hardships which Article 31 is designed to cushion. Rather than remain in employment with every Agreement right kept intact, the employees: were permanently dismissed from [Owens] employment, had no right to be employed by Anchor, went to work under Anchor's unilaterally established terms, and ended up (judging by what evidence there is respecting the new Anchor–[Union] Agreement) faring substantially worse than they would have fared had their rights under Article 33 been observed.

*Id.* at 23–24.[4]

### 3) Article 19 Section 17—Special Pension Benefits

Finally, the arbitrator summarily granted the special pension benefits called for in Article 19, Section 17. He found that the issue involved only a handful of employees,[5] and that the triggering language ("when the Company elects to close a plant permanently") was of the same import as the language used in Article 31. Accordingly, he granted the benefits for the same reasons given in the previous issue.

### C. The Parties' Contentions

From their voluminous submissions to the Court, we can briefly summarize the parties' respective positions. In essence, the Union maintains that Owens cannot satisfy the strong showing required to vacate an arbitration award. Arbitrators' awards are entitled to great deference and may not be vacated merely because the court disagrees with the arbitrator's factual or legal interpretations. Here, the arbitrator's analysis was not only rational, it was correct. Additionally, arbitrators are give wide latitude to fashion a remedy and, accordingly, the remedy imposed by Arbitrator Valtin must be enforced.

Owens maintains, in essence, that the arbitrator's award constituted a rewriting of the parties' labor agreement in plain violation of the express restriction in Article 9 of the agreement which states that "[t]he arbitrator shall have no power to add to, subtract from, or modify the terms of this contract...." They seize upon the arbitrator's finding that "the plant was not permanently closed as the parties intended the term to be applied," and argue that, rather than simply misinterpreting the contract, the arbitrator improperly modified the contract. Additionally, the same can be said for the arbitrator's finding that Owens had an affirmative obligation to condition the sale on the purchaser assuming the collective bargaining agreement. Finally, Owens maintains that, even if they are liable under the agreement, the arbitrator (1) prematurely reached the remedy issue, and (2) did not have support in the record to award the $2 million remedy.

## II. DISCUSSION

### A. Summary Judgment Standard

The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). *See, e.g., Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). In determining whether there remain any genuine issues of material fact, the court must resolve all reasonable doubt in favor of the nonmoving party. *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd.,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to deter-

---

**4.** The Union submitted tabulations to the arbitrator of the amount of severance payments due to the employees. The average per-employee payment came to approximately $5,500, and the sum for the workforce as a whole came to approximately $2 million. *Id.* at 24.

**5.** It appears that eight employees met the eligibility requirements of Article 19.

mine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Under this standard, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). Indeed, where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the non-moving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring), and not just "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

*B.  The Arbitral Award*

█ In the *Steelworkers trilogy,* the Supreme Court made clear that courts play an extremely limited role when asked to review the decision of an arbitrator. *See, United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *see also, United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987). Indeed, courts may not review the merits of an award even where there have been

serious errors of fact or misinterpretation of the contract. *Misco,* 484 U.S. at 36, 108 S.Ct. at 370. Otherwise, the federal policy of settling labor disputes would be undermined if courts had the final say on the merits of awards. *Id.* (citing *Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360). The test is whether "the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice.'" *Id.* (quoting *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361). This test has been strictly applied in this Circuit. It has been observed that "federal labor law elevates labor arbitrators to 'an exalted status.'" *News America Publications, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103,* 918 F.2d 21, 24 (3d Cir.1990) (quoting *Ludwig Honold, Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1126 (3d Cir.1969)). Just recently, in *News America,* Judge Higginbotham emphasized the courts' limited, indeed "undemanding" role:

> As long as the arbitrator has *arguably* construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that [the] arbitrator has committed a serious error.... This Court has held that there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of the award.... Thus, only where there is a 'manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.'

In this regard, a court may not review the merits of the arbitral decision.... A court does not review the award to ascertain whether the arbitrator has applied the correct principles of law.... An arbitral award may not be overturned for factual error, ... or because the court disagrees with the arbitrator's assessment of the credibility of witnesses, or the weight the arbitrator has given to testimony.... It should be clear that the test used to probe the validity of a

labor arbitrator's decision is a singularly undemanding one.

*Id.* (citations omitted; emphasis in original).

■ It must be borne in mind, however, that an arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers. *Leed Architectural Products, Inc. v. United Steelworkers of America, Local 6674,* 916 F.2d 63, 65 (2d Cir.1990). The arbitrator "may not shield an 'outlandish disposition of a grievance' from judicial review 'simply by making the right noises—noises of contract interpretation.'" *Id.* (quoting *Ethyl Corp. v. United Steelworkers of Am.,* 768 F.2d 180, 187 (7th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986)). Thus, where the court determines that the arbitrator violated the terms of the agreement, the court should not enforce the award. *See, e.g., Pennsylvania Power Co. v. Local Union No. 272 of International Brotherhood of Electrical Workers,* 886 F.2d 46, 49–50 (3d Cir. 1989) (arbitrator's determination that grievance concerning evaluation and compensation for newly created position was arbitrable was based on the general desirability of arbitration and a syllogistic interpretation of the terms of the labor agreement and, thus, exceeded the scope of his authority); *see also, United Food & Commercial Workers Union, Local 1119 v. United Markets, Inc.,* 784 F.2d 1413, 1415 (9th Cir.1986).

■ Owens maintains that the arbitrator exceeded his authority by reading an affirmative obligation to secure Anchor's assumption of the labor agreement into Article 33, where none existed. Whether or not this is so depends on how one views Owens' contractual obligation. Owens, by virtue of Article 33, made an obligation that the collective bargaining agreement, in its entirety, would "be binding upon the parties hereto, their successors, transferees and assigns." Owens, in effect, repudiated the contract three months prior to its mutually agreed upon duration. This was a clear breach of Article 1, Sections 1 and 3 (duration) as well as Article 33. Stating

that Owens had an affirmative obligation to secure the purchaser's assumption of the agreement may be viewed as simply another way of recognizing that Owens would be liable to the Union if the purchaser did not assume the agreement. Moreover, the arbitrator correctly observed that Owens and the Union were the only signatories to the contract. Thus, they could not purport to impose liability on a non-signatory third party. *Cf. Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 258 n. 3, 94 S.Ct. 2236, 2241 n. 3, 41 L.Ed.2d 46 (1974) (mere existence of successorship clause cannot bind successor to substantive terms of predecessor's collective bargaining agreement). Accordingly, the provision in Article 33 that

> [i]n the event the Company sells or transfers this plant, this agreement shall remain in full force and effect and be binding upon the purchaser or transferee

must be read as an obligation by Owens to the Union. When Owens sold the plant to Anchor and expressly agreed that the purchaser would not be bound by the collective bargaining agreement, it breached this obligation to the Union, and the Union was damaged thereby. Consequently, the arbitrator's conclusion that Owens had an affirmative obligation to secure the assumption by the purchaser, is grounded in sound principles of contract construction. *But see, Central States, Southeast and Southwest Areas Pension Fund v. PYA/Monarch of Texas, Inc.,* 851 F.2d 780, 783 (5th Cir.1988) (predecessor employer not obligated to continue contributions to pension fund on theory that successorship clause obligated employer to ensure that successor employer would adopt predecessor's collective bargaining agreement; court distinguished arbitration opinions which held to the contrary).

The flaw in Owens' argument is that almost every interpretation of a contractual provision which does not comport with another's interpretation of the same provision may be viewed by the latter as an addition to or modification of the contract. It is a leap in logic which is at once easy to make and, potentially threatening to the policies

underlying federal labor law. While there are rare instances where an arbitrator may attempt to impose his brand of industrial justice by adding to or modifying a contract, the instant case is simply not one of them.

■■■ Owens contends that the arbitrator's award should be vacated since a requirement that a purchaser assume the collective bargaining agreement would violate public policy as embodied in the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq. (West 1973 & Supp.1990). Owens notes that an employer is prohibited by section 8(a)(2) of the NLRA from recognizing or bargaining with a minority union. 29 U.S.C. § 158. The public policy set forth in the NLRA "represents well defined and dominant public policy." *Van Waters & Rogers, Inc. v. International Brotherhood of Teamsters, Local Union 70*, 913 F.2d 736, 742 (9th Cir.1990). In this case, had Anchor decided not to hire a majority of its workforce from the bargaining unit (which it had the right to do, *see NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972)), it would have violated federal labor law by recognizing a minority union. Rather, Anchor's duty to bargain with the Union, under federal law, did not arise until it hired a majority of its workforce from the former bargaining unit. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). Courts will refuse to enforce an arbitrator's award that violates the law or public policy. *Id.*, 913 F.2d at 743; *George Day Construction Co. v. United Brotherhood of Carpenters & Joiners, Local 354*, 722 F.2d 1471, 1477 (9th Cir.1984).

Owens' contention is without merit. First, the argument is merely hypothetical in this case since Anchor *did* hire a majority of its workforce and could have contractually obligated itself, perhaps conditioned on NLRA requirements, to assume the prior collective bargaining agreement. *See, generally*, R. Gorman, *Labor Law* 125 (1976) ("successor employer may, of course, assume obligations greater than those required by law and may, for example, expressly agree to abide by the predecessor's contract if the union is willing"). More important, however, is the fact that the Union does not seek specific performance from Anchor. Rather, it is seeking contractual damages from Owens for breach of the successorship clause by Owens' failure to bind Anchor to the collective bargaining agreement. In *Association of Flight Attendants v. Delta Air Lines, Inc.*, 879 F.2d 906 (D.C.Cir.1989), cert. denied, — U.S. —, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990), the Association of Flight Attendants ("AFA"), which represented the flight attendants of Western Airlines, Inc., sought damages against Delta Airlines, Inc. for Western's breach of a successorship clause (similar to the clause in this case)[6] when Western was acquired by Delta and failed to bind Delta to the Western–AFA collective bargaining agreement.[7] In considering whether the claim was arbitrable, the D.C. Circuit stated: "That AFA no longer has the right to specific enforcement of the successorship clause, however, simply does not answer the question whether Delta is answerable in damages for Western's alleged premerger breach of that clause." *Id.* at 910. The court held that an arbitrator could reasonably find that Western was obligated by the successorship clause to bind any merger partner to the collective bargaining agreement. *Id.* See also, *Howard Johnson*, 417 U.S. at 257–58, 94 S.Ct. at 2240–41 (where successor did not assume terms of predecessor's collective bargaining agreement and predecessor agreed to arbitrate with union, "presumably this arbitration will explore the question whether the [predecessor] breached the successorship provisions of their collective-bargaining

---

**6.** The clause in that case stated:

This agreement shall be binding on any successor or merged Company or Companies, or any successor in the control of the Company, its parent(s) or subsidiary(ies) until changed in accordance with the Railway Labor Act, as amended.

879 F.2d at 907.

**7.** Western sought a court order compelling arbitration on the damages issue.

agreements, and what the remedy for this breach might be") (footnote omitted). Accordingly, because we hold that the arbitrator's ruling did not violate public policy, the award can not be vacated on those grounds.

■ These cases also answer Owens' contention that the Union should have first arbitrated the dispute with Anchor. Because Anchor hired every Glassboro employee, the Union could have compelled Anchor, under the *Wiley* successorship doctrine, to arbitrate its obligations under the successorship clause. *See John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). We agree with the arbitrator's characterization of this argument as burden-switching. Under *Wiley* and *Burns,* although Anchor had an obligation to recognize and bargain with the Union upon the Union comprising a majority of its own workforce, Anchor, as successor, could not be required to assume Owens' labor contract. *See, generally, Burns, supra;* R. Gorman. *Labor Law* 116–25 (1976). The Union remained free to assert its rights under the contract that it had with Owens.

■ Owens also maintains that, even if it is liable under Article 33, the award of severance pay under Article 31 [8] was clearly a modification of the collective bargaining agreement in light of the arbitrator's explicit finding that "the plant was not permanently closed as the parties intended the term to be applied...." Arb. Op., at 22. As discussed above, the distinction between an "interpretation" and an "addition" to or "modification" of a contract is easily blurred. Here, the arbitrator's discussion immediately following the above-quoted language indicates his finding that the loss to the employees as a result of Owens' breach of Article 33 was not dissimilar to the type of hardships the parties intended the severance payments to cushion, even though the language used in Article 31 did not seem to cover this situation. Thus, there was a "plant closing" within the contemplation of the parties.[9] Although the arbitrator's opinion appears to indicate that the Article 31 remedy was solely as a result of the Article 33 breach, the opinion can also be read as his finding that the sale of the plant triggered the language in Article 31.[10] Indeed the arbitrator's opinion is ambiguous, and it is possible that he was merely imposing "his own brand of industrial justice." There is adequate support in the opinion, however, to conclude that the award draws its essence from the collective bargaining agreement. It is well settled that ambiguity in an arbitrator's opinion is not grounds to vacate the award. "Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement." *Enterprise Wheel,* 363 U.S. at 598, 80 S.Ct. at 1361 (footnote omitted). *See also, Newark Morning Ledger Co. v. Newark Typographical Union Local 103,* 797 F.2d 162,

8. The foregoing discussion applies to the arbitrator's award of retirement benefits under Article 19 as well as for the severance award.

9. This conclusion is consistent with other decisions which have compelled severance payment upon the sale of assets even where the employees continued to work for the purchaser and, especially where, as here, the purchaser does not provide severance benefits. *See Arco Metals Co.,* 88 Lab.Arb. 1209 (Berkowitz, Arb.1987); *see generally,* E. Hennessy, *Welfare Plans in Corporate Mergers and Acquisitions,* § IV.D. (P.L.I. 1989).

10. The arbitrator's summary disposition of the third issue (the Article 19 pension benefits issue) supports this conclusion. The arbitrator concluded that the triggering language of Article 19 was of the same import as the triggering language of Article 31, therefore, the same conclusion was mandated (*i.e.,* that the sale of the plant triggered the benefits and constituted a "plant closing" as the parties intended that provision to apply). Arb. Op. at 25.

Moreover, to the extent the arbitrator may have awarded the Article 31 benefits solely as a remedy for the Article 33 breach, we hold that the award would still draw its essence from the collective bargaining agreement. As noted above, this court's agreement with the arbitrator's factual or legal conclusions is simply irrelevant to our limited scope of review.

168 (3d Cir.1986) (Mannsman, J., dissenting).

Moreover, our conclusion is consistent with the Third Circuit's holding in *News America.* In that case, the arbitrator interpreted a provision of a collective bargaining agreement which provided that, in the event the company and the union are unable to reach agreement on wage adjustments, the following formula would apply:

> [t]he equivalent of any economic package granted by the DAILY RACING FORM to New York Mailers Union No. 6 or Newark Newspaper Printing Pressman's Union No. 8 (whichever is greater) during the twelve months prior to November 1 of any year will be automatically granted to Newark Typographical Union members effective on November 1.

*News America,* 918 F.2d at 22. The arbitrator found that this provision was intended to maintain the economic status of the defendant union with the Mailers and Pressman unions. Accordingly, because those unions had negotiated accelerations in their wage increases, the arbitrator accelerated defendants' wage increase by three months. In an action to vacate the award, the district court held that the term "effective November 1" cannot plausibly mean August 1, and concluded that it should not enforce an award that ignored the clear language of the contract. *Id.* at 23. The Third Circuit reversed, stressing that "the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." *Id.* at 25 (quoting *Misco,* 484 U.S. at 38, 108 S.Ct. at 371). Arbitrator Valtin did no more in the present case by finding that Article 31 was triggered by the sale to Anchor. The arbitrator's interpretation draws its essence from the collective bargaining agreement and must be enforced.

■ Even assuming that Owens is liable to the Union under the collective bargaining agreement, Owens contends that Arbitrator Valtin exceeded the scope of his authority since the parties allegedly did not submit the remedy issue to him and, more-

over, there was insufficient evidence in the record to support the remedy that he ultimately imposed. In support of this contention, Owens has submitted the affidavits of Messrs. John D. Frechette, Owens' Vice President of Labor Relations and Arthur E. Grills, Owens' Manager of Group Insurance, who both assert that, when the Union offered an exhibit showing the losses incurred as a result of the changes in fringe benefits made by Anchor, Owens and the Union "discussed the remedy issue and they agreed that if liability was found by the Arbitrator the parties themselves would attempt to resolve the appropriate remedy while the Arbitrator retained jurisdiction to decide the remedy if the parties were unable to agree." Affidavit of John D. Frechette, at ¶ 9; affidavit of Arthur E. Grills, at ¶ 9. Moreover, the Union specifically requested in their post arbitration brief and reply brief that the arbitrator retain jurisdiction while the parties sought to resolve the remedy. Defendant's Exhibits A & B in Support of Their Crossmotion to Vacate the Arbitration Award.

However, the record before us does not indicate that either party ever notified the arbitrator of any restrictions on his remedial authority. Although the affidavits submitted by Owens suggest that the parties themselves may have made such an agreement, there is no basis upon which we can conclude that the arbitrator exceeded the scope of his authority. The Union specifically raised the remedy issue in its issue statement. *See* note 3, *supra.* Although arbitrators may not impose a remedy which directly contradicts the express language of the collective bargaining agreement, *see, Leed Architectural,* 916 F.2d at 65, so long as the remedy draws its essence from the collective bargaining agreement, arbitrators have broad discretion in establishing the scope of the issue before them and in formulating remedies. As the Supreme Court noted in *Enterprise Wheel,*

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies.* There the need is

for flexibility in meeting a wide variety of situations.

363 U.S. at 597, 80 S.Ct. at 1361 (emphasis added). In this case, once the arbitrator concluded that the severance and retirement payments were warranted, the damages were determined by reference to a specific formula and no additional evidentiary hearing was necessary. Having concluded that the arbitrator did not exceed the scope of his contractual authority, our inquiry must end and his remedy must be enforced.

Owens vehemently contends that any damages to the Union beyond the approximately $32,000 in lost fringe benefits is pure speculation. They maintain that even if the company had required Anchor to accept the collective bargaining agreement, the agreement would have expired by its own terms and thus there was absolutely no evidence that the Union would have ended up in any better position had Anchor initially assumed the previous agreement. It is precisely for this reason, however, that Owens would have been wise to either wait three months before selling the plant or, alternatively, to negotiate for Anchor to assume the agreement for the brief period remaining. Simply put, their argument would have had more force on the negotiating table then it is in this forum. No doubt, the parties had there own reasons for consummating the sale at the time and in the manner in which they did. However, Owens' argument is completely undermined when the severance payments are viewed as having been awarded by its own terms, in accordance with in Article 31, rather than as an approximation of damages for the breach of Article 33. As discussed above, this conclusion has adequate support in the arbitrator's opinion. This being the case, the severance payments are calculated from the precise formula found in the collective bargaining agreement and there becomes no basis on which to conclude that this award does not draw its essence from that agreement.

*C. Prejudgment Interest, Costs and Attorneys Fees*

Finally, the Union seeks prejudgment interest, costs and attorneys' fees.

District courts have broad discretion in determining whether to allow prejudgment interest in claims arising under federal labor law. *See Ambromovage v. United Mine Workers,* 726 F.2d 972, 982 (3d Cir. 1984). The general rule is that prejudgment interest is awardable when the damages from breach of contract are ascertainable with mathematical precision. *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 973 (3d Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976); *see also, Feather v. United Mine Workers,* 711 F.2d 530, 540 (3d Cir.1983). Since the severance and retirement payments constitutes a liquidated amount, prejudgment interest is appropriate in this case.

We decline to award attorneys' fees, however, since Owens has not litigated in bad faith, vexatiously, or for oppressive reasons. *See, Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299, 305 (3d Cir.1982). In the absence of such bad faith, under the American rule, each party bears the burden of its own legal expenses. *Id.* Especially in light of the ambiguity of the arbitrator's opinion in this case, Owens has presented a good faith challenge to the award and has done so promptly.

## III. CONCLUSION

For the aforementioned reasons, we hold that the arbitrator's opinion and award draws its essence from the Owens–Union collective bargaining agreement with respect to both liability and remedy imposed. Accordingly, plaintiff's motion to enforce the arbitration award will be GRANTED, and defendant's motion to vacate the arbitration award will be DENIED. Each party shall be responsible for its own costs, except that defendant shall be responsible for prejudgment interest from the date of the arbitration award.